ROBERTS, J.,
concurring in part, dissenting in part.
¶ 31. I concur with the majority’s resolution of Issues I, III, IV, and V. However, I disagree with the majority’s conclusion that the chancellor properly ordered Dr. Smith to pay Ms. Smith rehabilitative alimony. In my opinion, Ms. Smith’s vehement and unequivocal position that she did not intend to enter the work force for at least several years precludes an award of rehabilitative alimony. Because the majority chooses to affirm that portion of the chancellor’s award, regardless of Ms. Smith’s own testimony, I must respectfully dissent to that portion of the majority’s decision.
¶ 32. The majority notes that “[rjehabil-itative alimony provides for a party who is trying to become self-supporting and prevents that party from becoming destitute while searching for a means of income.” Voda v. Voda, 731 So.2d 1152, 1155(¶ 8) (Miss.1999). The majority also correctly states that “[t]he primary purpose of rehabilitative alimony is to give the former spouse the opportunity to enter the work force.” Alexis v. Tarver, 879 So.2d 1078, 1080(¶ 7) (Miss.Ct.App.2004). However, the majority then goes on to analyze the chancellor’s findings regarding rehabilitative alimony. According to the majority, the chancellor’s findings were sufficient because the chancellor discussed the parties’ earning capacities, the fact that Ms. Smith would have to take some unidentified number of classes at some unidentified expense before reentering the work force as a nurse, custody of Coleman, Ms. Smith’s age, and the parties’ standard of living. According to the majority, “[t]he rehabilitative alimony awarded to Ms. Smith would serve the purpose of preparing her to reenter the work force when [her] son reaches the age of eighteen.” The majority then “yields to the chancellor’s discretion.”
¶ 33. I cannot agree with the majority’s decision to yield to the chancellor’s discretion in this instance. To do so would fly in the face of the stated purposes of rehabilitative alimony. Ms. Smith unequivocally denied that she was “trying to become self-supporting” or “searching for a means of income.” Voda, 731 So.2d at 1155(¶ 8). Likewise, she absolutely refused to even consider entering the work force before Coleman left home, so there was no need to “give [her] the opportunity to enter the work force” because she did not intend to do so. As previously mentioned, giving the recipient spouse an opportunity to enter the work force is the “primary purpose of rehabilitative alimony.” Alexis, 879 So.2d at 1080(¶ 7). According to Ms. Smith, she stopped working as a regis *379 tered nurse in 1991, after she married Dr. Smith. At the time of trial, Ms. Smith testified that her son, Coleman, would be living at home “for at least seven more years.” During Ms. Smith’s redirect testimony, the following exchange occurred:
Q. You are not looking for a job, are you?
A. No.
Q. You are not going to look for a job until after [Coleman] is grown—
A. Right.
Q. —which is after he is 18.
A. Right.
Q. At which time, what? Are you going to go to work?
A. Try to.
Q. Have any idea what you are going to do?
A. No, sir.
Q. To be a nurse you got to go back to school and get some more education or do something to get certified, correct?
A. Correct.
Q. Is it at all operable, worthwhile for you to try to get a job and do all of this stuff with Coleman as busy as you and Coleman are? Is that anything that is possible for you without upsetting the entire apple cart?
A. It would do that.
¶ 34. Not only did Ms. Smith unequivocally state that she had no intention of working for at least seven years, she also did not state that she intended to work as a nurse. Although she testified that she would have to update her education if she worked as a nurse, when asked whether she had any idea about what she would do if she reentered the work force, she responded, “[n]o, sir.” Consequently, Ms. Smith never testified that she intended to take classes to regain her certification to work as a nurse, and she never testified that she intended to work as a nurse. At best, Ms. Smith’s testimony indicated that, after at least seven years, she might reenter the work force, she might update her certification, and she might work as a nurse.
¶ 35. Additionally, as previously mentioned, “[rehabilitative alimony provides for a party who is trying to become self-supporting and prevents that party from becoming destitute while searching for a means of income.” Voda, 731 So.2d at 1155(¶ 8) (emphasis added). Ms. Smith was not at risk of becoming destitute. As the majority points out in its analysis of the chancellor’s equitable distribution, the chancellor awarded Ms. Smith a net award of more than $314,000 in assets. The chancellor also ordered Dr. Smith to pay one-half of Ms. Smith’s attorney’s fees, which amounted to more than $15,000. While Dr. Smith’s obligation to pay Ms. Smith child support for Coleman’s benefit in the amount of approximately $2,700 per month is to support Coleman, certainly some portion of that figure will aid in preventing Ms. Smith from becoming destitute. As stated by the chancellor, Ms. Smith would need child support to transport Coleman to and from school and his extracurricular activities. Child support surely implies providing food, shelter, utilities, clothing, and numerous other things that will not have to be provided through Ms. Smith’s alimony award. Finally, the chancellor ordered Dr. Smith to pay Ms. Smith periodic alimony payments of $2,000 per month. Through child support and alimony alone, Ms. Smith will receive approximately $4,700 each month for a total of $56,400 per year. Although it is true that Dr. Smith has a greater earning capacity than Ms. Smith, precedent dictates that rehabilitative alimony “is not intended as an equalizer between the parties but is for the purpose of allowing the less able party to start anew without being destitute *380 in the interim.” Wolfe v. Wolfe, 766 So.2d 123,129(¶ 11) (Miss.Ct.App.2000).
¶ 36. Our standard of review requires that we leave the chancellor’s decision undisturbed unless it is manifestly wrong or clearly erroneous. R.K. v. J.K., 946 So.2d 764, 772(¶ 17) (Miss.2007). I recognize that these considerations are “particularly true” in the context of a chancellor’s decision to award or to decline an award of rehabilitative alimony. Turpin v. Turpin, 699 So.2d 560, 564 (Miss.1997). Be that as it may, the converse is also true. That is, we are required to reverse the chancellor if the chancellor’s decision is manifestly wrong. In my opinion, the chancellor committed reversible error when he ordered Dr. Smith to pay Ms. Smith rehabilitative alimony despite Ms. Smith’s own testimony that she did not intend to enter the work force for at least seven years. Even after seven years, at best, Ms. Smith’s testimony indicated that she might go back to work, and that she might need additional training. There was no testimony as to how much training she would need or how much that training would cost. Finally, there is no evidence that Ms. Smith would be “destitute” if she decided to pursue that additional training at some speculative time in the future. In my opinion, the chancellor’s decision was contrary to the undisputed evidence in this case and the stated purposes of rehabilitative alimony. Accordingly, I would find that there was no evidence, substantial or otherwise, that supports the chancellor’s rehabilitative alimony award. Because the majority finds no fault with the chancellor’s decision, I respectfully dissent.
ISHEE, J., JOINS THIS OPINION. IRVING, J., JOINS THIS OPINION IN PART.